484 So.2d 912 (1986)
In re Sheldon D. BEYCHOK and Wolf Baking Company, Inc.
No. 85 CA 0903.
Court of Appeal of Louisiana, First Circuit.
February 25, 1986.
Writ Granted May 1, 1986.
*914 Charles S. McCowan, Jr., Pamela C. Walker, Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, Baton Rouge, Leslie J. Schiff, Sandoz, Sandoz & Schiff, Opelousas, for appellants.
R. Gray Sexton, Peter G. Wright, Commission on Ethics for Public Employees, Baton Rouge.
Before CARTER, SAVOIE and LANIER, JJ.
CARTER, Judge.
Sheldon D. Beychok (Beychok) and Wolf Baking Company, Inc. (WBC, Inc.) appeal from a decision of the Commission on Ethics for Public Employees (Commission) which held that Beychok violated LSA-R.S. 42:1111 C(2)(d) and LSA-R.S. 42:1112 B(2) and (3) and that WBC, Inc. violated LSA-R.S. 42:1113 B. The Commission ordered that Beychok, WBC, Inc. and Louisiana State University and Agricultural and Mechanical College (LSU) cancel all existing contracts, discontinue the purchase of goods pursuant to all previous contracts, and refrain from entering into any future contractual relationships. The Commission, however, specifically found that neither Beychok nor WBC, Inc. were guilty of any intentional wrongdoing or act of corruption and that Beychok had not used his office of public trust for personal gain. Further, it is uncontradicted that LSU benefited by several thousand dollars as a result of the contracts.

FACTS
Beychok has served as a member of the Board of Supervisors of LSU (Board of Supervisors) since his appointment in 1978. Beychok also serves, and at all pertinent times hereto did serve, as President, Chief Executive Officer, director, and majority stockholder of WBC, Inc., a Louisiana corporation engaged in the production and sale of bread and bakery products. As an employee of WBC, Inc., Beychok receives a salary for services he renders to WBC, Inc.
Between January 1, 1981, and December 31, 1984, WBC, Inc. entered into a series of contracts with LSU for the sale of food products to the university, awarded after receipt of sealed competitive bids.
*915 These contracts authorized purchases of $219,088.00 by the University from WBC, Inc. during the contract periods, though actual purchases were for slightly lesser amounts. In January of 1985, approximately six months after their inception, some of these contracts were renewed and, as a result of these renewed contracts, it was estimated that the University would purchase from WBC, Inc. during the period January 1, 1985, through June 30, 1985, products costing a total of $27,758.00.
Additionally, WBC, Inc. contracted with the director of the LSU Athletic Department for advertising on the "end zone countdown clocks" in LSU's football stadium. This occurred after repeated unsuccessful attempts by the Athletic Department to lease advertising space to other parties.
The Athletic Director of LSU, Robert E. Broadhead, offered to lease space on one of the clocks to WBC, Inc. for the 1984 football season at a price of $5,000.00. The agreement was later amended to lease advertising space on both end zone clocks for $6,500.00. In a letter dated September 12, 1984, Beychok accepted this offer on behalf of WBC, Inc. The Board of Supervisors took no part in the advertisement or award of this advertising contract. It was a negotiated contract and not awarded as the result of a sealed competitive bid as were the contracts for bakery items.
By correspondence dated August 23, 1984, Beychok and other members of the Board of Supervisors sought from the Commission an advisory opinion as to the propriety of members of the Board entering into contracts for the sale of goods and services to LSU.
The Commission considered this request at its September 14, 1984, meeting and concluded that LSA-R.S. 42:1111 C(2)(d), 1112 B(2) and (3), and 1113 B prohibit members of the Board from entering into business transactions with LSU.
Prior to publication of the Commission's opinion, Beychok sought to enjoin implementation of the Commission's interpretation of the Code of Governmental Ethics by instituting civil proceedings in the Nineteenth Judicial District Court entitled "Wolf Baking Company, Inc. v. Louisiana Commission on Ethics for Public Employees, Board of Supervisors, Louisiana State University and Various Purchasing Agents" (Docket No. 281,335-K). The trial judge rendered judgment in favor of the Commission and against WBC, Inc. granting the Commission's declinatory, dilatory and peremptory exceptions pleading the objections of lack of jurisdiction, prematurity and no cause of action, respectively. This judgment is now final. The trial court subsequently issued a preliminary injunction prohibiting the cancellation of any contract for the supply of bread previously awarded WBC, Inc. or any advertising previously purchased by WBC, Inc.
On October 2, 1984, the Commission adopted a resolution calling for a staff investigation of the events referred to in the petition filed by Beychok and WBC, Inc. in district court.
At its November 2, 1984, meeting and on the basis of the information contained in its investigation report, the Commission, by a majority vote of its membership, ordered that a public hearing be conducted for the purpose of exploring the following charges:
That Mr. Sheldon D. Beychok has violated Section 1111C(2)(d) of the Code of Governmental Ethics (LSA-R.S. 42:1111C(2)(d)) by having received a thing of economic value in the form of compensation for services rendered by him to Wolf Baking Company, Inc. at a time and under circumstances such that he was prohibited from receiving a gift from Wolf Baking Company, Inc., for the following reasons and in the following manner, to wit:
1. The Board of Supervisors, Louisiana State University and Agricultural and Mechanical College, of which Mr. Beychok is and has been a member since June, 1978, has supervision and jurisdiction over contracts entered into by Louisiana State University and Agricultural and Mechanical College.
*916 2. Louisiana State University and Agricultural and Mechanical College has the following contracts with Wolf Baking Company, Inc.:
(a) A contract entered into in response to LSUA Bid No. 1233;
(b) A contract entered into in response to LSUA Bid No. 1236;
(c) A contract entered into in response to Bid B3DRP1411, dated January 24, 1983;
(d) A contract entered into in response to Bid B3DRP1573, dated January 13, 1984;
(e) A contract entered into in response to Bid B3BGR2363, dated May 9, 1984;
(f) Purchase Order No. 54242, dated July 1, 1984, for the LSU Union Food Service;
(g) Purchase Order No. 54245, dated July 1, 1984, for the LSU Union Food Service;
(h) A contract entered into in response to Bid B4BGR3118, dated July 9, 1984;
(i) Purchase Order No. S105774, dated July 11, 1984, for the Faculty Club;
(j) Purchase Order S105777, dated July 11, 1984, for the Residence Food Service, Food Service Store;
(k) Purchase Order No. S105779, dated July 11, 1984, for the University High Cafeteria;
(l) Purchase Order No. S105913, dated July 17, 1984, for Athletic Concessions;
(m) Purchase Order No. S103214, dated July 23, 1984, for the Residence Food Service, Food Service Store; and
(n) A contract for advertising on the "end zone countdown clocks" at Tiger Stadium for the 1984 football season.
3. As a result of said contracts Wolf Baking Company, Inc. had interests that may have been substantially affected by Mr. Beychok's performance or nonperformance of his official duties as a member of the Board of Supervisors.
4. Mr. Beychok had knowledge of the fact that Wolf Baking Company, Inc. was seeking to obtain and in fact obtained these contracts with Louisiana State University and Agricultural and Mechanical College.
5. Because Wolf Baking Company, Inc. had and was seeking to obtain contractual and other business or financial relationships with Louisiana State University and Agricultural and Mechanical College and because, by virtue of these contractual and other business or financial relationships, Wolf Baking Company, Inc. had interests which may have been substantially affected by the performance or nonperformance of Mr. Beychok's official duties as a member of the Board of Supervisors, Mr. Beychok was prohibited by reason of Section 1115 A(1) and B of the Code from receiving as a gift anything of economic value from Wolf Baking Company, Inc.
6. At all times material hereto, Mr. Beychok was a compensated officer, director, and employee of Wolf Baking Company, Inc. and, accordingly, was prohibited by Section 1111C(2)(d) of the Code from receiving anything of economic value, including compensation, in consideration of any services he rendered or renders to Wolf Baking Company, Inc.

II.
That Mr. Sheldon D. Beychok has violated Section 1112 B(2) and (3) of the Code of Governmental Ethics (LSA-R.S. 42:1112 B(2) and (3)) by having `participated,' both by virtue of his membership on the Board of Supervisors, and in fact, in particular transactions in which Wolf Baking Company, Inc. (an entity in which he owned a majority of the stock and in which he was an officer, director, and employee) had a substantial economic interest, in the following manner, to wit:
1. The Board of Supervisors, Louisiana State University and Agricultural and Mechanical College, has a statutory responsibility to supervise and exercise jurisdiction over contracts to which Louisiana State University and Agricultural and Mechanical College is a party, including those contracts listed in the preceding Charge.
*917 2. As a member of the Board of Supervisors Mr. Beychok has `participated,' as that term is defined in the Code of Governmental Ethics, in the Board of Supervisors' supervision of and exercise of jurisdiction over the above-referenced contracts between Louisiana State University and Agricultural and Mechanical College and Wolf Baking Company, Inc.
3. At an August 10, 1984 meeting the Board of Supervisors received a report titled `Transactions with firms in which Board members have declared an interest,' in which Wolf Baking Company, Inc.'s doing business with Louisiana State University and Agricultural and Mechanical College was reported.
4. Mr. Beychok participated in the Board of Supervisors' receipt and consideration of that report.
5. Mr. Beychok has a 65% ownership interest in Wolf Baking Company, Inc.
6. Mr. Beychok serves as an officer and director of Wolf Baking Company, Inc.
7. Mr. Beychok knew that Wolf Baking Company, Inc. had a substantial economic interest in the above-referenced contracts with Louisiana State University and Agricultural and Mechanical College.
That Wolf Baking Company, Inc., in which Mr. Sheldon D. Beychok, a member of the Board of Supervisors, Louisiana State University and Agricultural and Mechanical College, has a 65% ownership interest, violated Section 1113 B of the Code of Governmental Ethics (LSA-R.S. 42:1113 B) by bidding on, entering into, and having an economic interest in the following contracts with Louisiana State University and Agricultural and Mechanical College, which contracts are under the supervision and jurisdiction of the Board of Supervisors:
(1) A contract entered into in response to LSUA Bid No. 1233;
(2) A contract entered into in response to LSUA Bid No. 1236;
(3) A contract entered into in response to Bid B3DRP1411, dated January 24, 1983;
(4) A contract entered into in response to Bid B3DRP1573, dated January 13, 1984;
(5) A contract entered into in response to Bid B3BGR2363, dated May 9, 1984;
(6) Purchase Order No. 54242, dated July 1, 1984, for the LSU Union Food Service;
(7) Purchase Order No. 54245, dated July 1, 1984, for the LSU Union Food Service;
(8) A contract entered into in response to Bid B4BGR3118, dated July 9, 1984;
(9) Purchase Order No. S105774, dated July 11, 1984, for the Faculty Club;
(10) Purchase Order S105777, dated July 11, 1984, for the Residence Food Service, Food Service Store;
(11) Purchase Order No. S105779, dated July 11, 1984, for the University High Cafeteria;
(12) Purchase Order No. S105913, dated July 17, 1984, for Athletic Concessions;
(13) Purchase Order No. S103214, dated July 23, 1984, for the Residence Food Service, Food Service Store; and
(14) A contract for advertising on the "end zone countdown clocks" at Tiger Stadium for the 1984 football season.
The Commission concluded that Beychok and WBC, Inc. had violated the Code of Governmental Ethics by virtue of (1) WBC, Inc. having entered into contracts with LSU, (2) Beychok having received compensation (his salary) from WBC, Inc. during the time that these transactions took place, and (3) Beychok having participated, by operation of law, in the food service contracts and personally in the transactions involving the leasing of the countdown clocks.
No remedial or other disciplinary action was taken by the Commission against Beychok or WBC, Inc. The Commission's action was limited to ordering the discontinuation of the existing contracts between Beychok's company and the university and mandating that the university refrain from entering into future contracts with members of its governing authority.
From this decision, Beychok and WBC, Inc. appeal. For purposes of clarity, our *918 discussions will treat the bread contracts[1] and the contract for end zone countdown clock advertisement separately.

CONTRACT FOR END ZONE COUNTDOWN CLOCK ADVERTISEMENT

LSA-R.S. 42:1111 C(2)(d)
LSA-R.S. 42:1111 C(2)(d) provides as follows:
(2) No public servant and no legal entity in which the public servant exercises control or owns an interest in excess of twenty-five percent, shall receive any thing of economic value for or in consideration of services rendered, or to be rendered, to or for any person during his public service unless such services are:
(d) Neither performed for nor compensated by any person from whom such public servant would be prohibited by R.S. 42:1115(A)(1) or (B) from receiving a gift.[2]
In other words, LSA-R.S. 42:1111 C(2)(d) prohibits a person from drawing a salary for his services to a company, if that company is doing business with the public servant's agency.
Counsel for Beychok strenuously contends that the contract for the end zone countdown clock advertising space is not under the supervision or jurisdiction of the Board of Supervisors.
Article VIII, § 7 of the Constitution of the State of Louisiana provides that the Board of Supervisors shall "supervise and manage the institutions, statewide agricultural programs, and other programs administered through its system."
LSA-R.S. 17:3351 A provides, in pertinent part, that the LSU Board of Supervisors:
[S]hall have authority to exercise all power to direct, control, supervise and manage the institutions of higher education under its control, including but not limited to the following:
(1) Sue and be sued, ...
. . . . .
(3) Receive and expend or allocate for expenditure to the institutions under its jurisdiction all monies appropriated or otherwise made available for purposes of the board and/or the institutions under its jurisdiction.
. . . . .
(7) Purchase equipment, properly maintain and make improvements to facilities necessary for the use of the university system, in accordance with applicable laws.
. . . . .
(18) Perform such other functions as are necessary or incidental to the supervision and management of the university system it supervises and manages. (Emphasis added)
Further, under LSA-R.S. 17:3355(A):
All purchases, contracts and other business transactions shall be made on terms most favorable to the college or university *919 for which the purchase is made, the contract is executed or to which the business transaction relates. All purchases made and contracts executed shall conform to applicable state laws relating to competitive bidding and the letting of contracts. The purchasing agent of each college and university shall be a deputy purchasing agent of the state central purchasing agency.
Section 5-4 of the Bylaws of the Board of Supervisors also provides a procedure whereby all university system contracts are to be executed. Section 5-4 provides that:
(a) Contracts involving the purchase or sale of land, mineral rights, and other immovables; those involving significant University System policy; and major construction contracts shall be signed by the President only after approval of the Board or a specifically designated committee thereof.
(b) All other contracts may be executed on the authority of an official of the University System or of its various campuses as designated by the President unless directed to be otherwise executed by the Board or a specifically designated committee thereof.
Although the LSU system is exempt from the requirement of purchasing through the State Central Purchasing Agency, it is still subject to all the requirements and regulations promulgated by the Commissioner of Administration and the Public Bid Law. LSA-R.S. 39:1572(B)[3] and LSA-R.S. 38:2211-2226. The Procurement Code further recognizes the Purchasing Agency of each campus as a deputy purchasing agent of the Commissioner of Administration and the "Chief Procurement Officer" for that campus. LSA-R.S. 39:1556(3); LSA-R.S. 17:3355 A. On the Baton Rouge campus, the Procurement officers are the Vice-Chancellor for Business Affairs and Director of Purchasing, and the Director of Athletics for the Baton Rouge campus insofar as the Athletic Department is concerned.
The Campus Purchasing Agent as procurement officer and state deputy purchasing agent under the Commission of Administration is vested with the authority to resolve any controversy regarding the award of a contract under the Procurement Code. LSA-R.S. 39:1671. If the dispute is not resolved, the administrative appeal is to the Commissioner of Administration pursuant to LSA-R.S. 39:1681. Therefore, it is clear that the LSU Board is not involved in the review process as concerns transactions and contracts with the University.
In the case sub judice, Athletic Director Broadhead testified that certain duties and responsibilities were delegated to him by Chancellor Warton pertaining to advertising arrangements with various vendors and suppliers for the football stadium at LSU during the 1984 football season. These duties and responsibilities included the authority to negotiate agreements, submit them to the Vice-Chancellor of Business Affairs for a determination as to whether university procedures had been violated, and conclude the agreement once it was determined that university procedures had *920 been adhered to. He testified that the Board of Supervisors has never interfered with any type of arrangement for advertising through memorandum, regulation, resolution or otherwise. He testified that he reported to the Chancellor, not to the Board of Supervisors. Broadhead admitted, however, that the Chancellor reported to the Board of Supervisors. In connection with the transaction with Beychok, Broadhead testified by deposition as follows:
A. Mr. Beychok was in my office regarding several other things and had asked me about the countdown clocks at one time previous. I had been trying to get proposals from other people. I approached McDonalds, I approached Burger King, I approached Coca-Cola, I approached a lot of people trying to convince them that was a good advertising buy. Mr. Beychok wanted to know how much I wanted for one, so when he was in my office I told him we wanted five thousand dollars for one, and he called his advertising people from my office and they agreed to go with it. He then went back to his office and called me back and asked me if we had sold the other one, and I told him no, we hadn't sold it and it didn't look like we really had any takers, and he said, how much would you take for two of them, and I said I'd take 65 hundred dollars for two of them. So, basically, the letters were written a day apart, and I see I have the 12th on here. But, one actually took place first, and then I went back and rewrote the deal. Somebody put the 12th on there, but it follows in that order.
Q. Did the University lose any money by virtue of you contracting with Wolf for these end zone countdown clocks?
A. No, we never sold them before, so we made 65 hundred dollars.
Q. Had anybody offered you a higher price?
A. Nobody offered us dollar one.
Q. And you set the price?
A. Yes, sir.
Q. And Mr. Beychok being on the Board of Supervisors, did he or the faculty that was on the Board of Supervisors in any way influence your setting the price or your agreement with Wolf?
A. No, I had no other bidders for them, so I set the price and he took it.
Q. This was actually a benefit to the Louisiana State University?
A. 65 hundred dollars was.
Q. You wouldn't have ordinarily
A. No, we wouldn't have had anything for them.
Q. Did Mr. Beychok in any way, by virtue of his position on the Board of Supervisors, influence you on granting this?
A. No, sir.
Therefore, although the Board of Supervisors has general jurisdiction and supervision of all activities of LSU, it has no direct supervision or jurisdiction over contracts entered into under the Procurement Code. These contracts are under the supervision and jurisdiction of the purchasing agent, who is by law a deputy purchasing agent of the Division of Administration, with the Commissioner of the Division of Administration, not the Board of Supervisors, being the final authority. The Commission was correct in its determination that the Board of Supervisors had "supervision" and "jursidiction" over the contract for advertising space on the end zone countdown clocks although this "supervision and jurisdiction" is very remote and far removed from letting, accepting or rejecting contracts for goods and services. However, the Code does not require direct jurisdiction and supervision to be applicable.
Therefore, even though the Board of Supervisors had nothing to do with the awarding of the contract for advertising space on the end zone countdown clocks and had no direct jurisdiction or supervision thereof, this negotiated contract constituted a violation of LSA-R.S. 42:1111 C(2)(d). Even though the contracts with Beychok resulted in substantial benefit to LSU, which may not have been received had the contract not been entered into, and even *921 though there was no undue influence or improper action on the part of Beychok, there was a violation of LSA-R.S. 42:1111 C(2)(d). We, therefore, affirm the Commission's finding of a violation.

LSA-R.S. 42:1112 B(2) and (3)
LSA-R.S. 1112 B(2) and (3) provides as follows:
B. No public servant, except as provided in R.S. 42:1120, shall participate in a transaction involving the governmental entity in which, to his actual knowledge, any of the following persons has a substantial economic interest:
(2) Any person in which he has a substantial economic interest of which he may reasonably be expected to know.
(3) Any person of which he is an officer, director, trustee, partner, or employee.
In plain language, this section restricts a public servant from "participating in any transaction," if to the public servant's knowledge, any of certain designated "persons" would have a substantial economic interest in the transaction. "Persons" include any person in which the public servant has a substantial economic interest as well as any person of which the public servant is an officer, director, trustee, partner or employee.
Clearly, Beychok has an ownership interest in WBC, Inc. which brings him within the prohibitions of this provision, provided it is determined that he "participated" in the transaction.
LSA-R.S. 42:1102(15) defines "participate" as follows:
"Participate" means to take part in or to have or share responsibility for action of a governmental entity or a proceeding, personally, as a public servant of the governmental entity, through approval, disapproval, decision, recommendation, the rendering of advice, investigation, or the failure to act or perform a duty.
LSA-R.S. 42:1102(20) defines "responsibility" as:
"Responsibility" in connection with a transaction involving a governmental entity means the direct administration or operating authority, whether intermediate or final, and either exercisable alone or with others, and either personally or through or with others or subordinates, to effectively direct action of the governmental entity, as the case may be, in respect to such transaction.
It is important to note that "participation" and "responsibility" as defined in the Code refers to participation as a member of the Board or agency that has direct administration or operating authority and does not apply to participation personally. As we have previously noted, the authority to regulate and supervise the awarding of these contracts is delegated to the Director of the Division of Administration, the Athletic Director and the President of the LSU system. The Board of Supervisors does not have any direct role in the process of awarding this contract nor in review or approval of the decision. As a member of the Board of Supervisors, Beychok never approved the end zone countdown clock advertising contract, recommended its approval, investigated it, or did anything at all in connection therewith, except personally negotiating the contract with the Athletic Director, Mr. Broadhead.
However, we are constrained to hold that since LSA-R.S. 42:1102(15) provides that participation occurs not only when a public servant acts affirmatively in his official capacity, but also when the public servant has or shares responsibility for some actions. In effect, the legislature has declared that appointed members of boards and commissions are deemed by operation of law to have participated in transactions for which they have or share responsibility, regardless of any failure to act or perform that duty. See Glazer v. Commission on Ethics, 417 So.2d 456 (La.App. 1st Cir. 1982), reversed on other grounds, 431 So.2d 752 (La.1983). In Glazer, the Supreme Court stated: "The Commission has not reurged its finding that Mr. Glazer has violated 42:1112B(5) and we accordingly make no decision or comment about such a *922 violation." However, the Supreme Court did set forth:
The Code is not a criminal statute whose aim is the apprehension and punishment of persons guilty of public wrongdoing. Instead, the primary objective of the legislation is to prevent public officers and employees from becoming involved in conflicts of interests. A conflict of interest is a situation which would require an official to serve two masters, presenting a potential, rather than an actuality, of wrongdoing. The wrongdoing does not have to occur in order for a prohibited conflict to exist. A public official may have done no wrong in the ordinary sense of the word, but a conflict of interest may put him in danger of doing wrong. See United States v. Mississippi Valley Generating Co., 364 U.S. 520, 549-50, 81 S.Ct. 294, 309-10, 5 L.Ed.2d 268, 288 (1961). The Code is aimed at avoiding even this danger. For this purpose, the Code of Ethics for Governmental Employees identifies certain types of conflicts of interests and prohibits conduct by public officials which would bring these conflicts into being. Additionally, the Code empowers the Commission on Ethics to determine when a conflict of interest exists and to impose certain sanctions. La.R.S. 42:1134-35, 1141, and 1151-56.
The prohibited conflict of interest situation involved in this case is one in which the public servant receives private compensation from persons having business with his public agency for services rendered by the servant to that person outside the servant's regular government employment. The danger in the conflict, of course, is that the public servant's official dealings with the person may be unduly influenced contrary to the public interest by the public servant's receipt of private compensation from the same person. The danger exists even if the public servant actually performs bonafide services for his outside income. Accordingly, The Code of Ethics for Governmental Employees specifically prohibits any public servant from receiving anything of economic value for or in consideration of services rendered to or for any person if such public servant knows or reasonably should know that such person has or is seeking to obtain contractual or other business or financial relationships with the public servant's agency. La.R.S. 42:1111(C)(2); 42:1115(A). (Footnote omitted)[4] 431 So.2d at 755-756.
Therefore, where the public servant personally negotiates a contract with an official of the public body on which he serves, the distinction between participation as a public servant and participation as a private individual becomes sufficiently blurred to the extent that "constructive" participation occurs when, in fact, no direct participation took place. See Glazer, 417 So.2d 456.
We, therefore, conclude that the Commission correctly determined that Beychok had "constructively" participated in the transaction involving the countdown clocks in violation of LSA-R.S. 42:1112 B(2) and (3) of the Code.

LSA-R.S. 42:1113 B
The Commission also found that WBC, Inc. had violated LSA-R.S. 42:1113 B by entering into and having an economic interest in the contract for advertising space on the end zone countdown clocks. LSA-R.S. 42:1113 B provides as follows:
Other than a legislator, no appointed member of any board or commission, member of his immediate family, or legal entity in which he has an economic interest shall bid on or enter into or be in any way interested in any contract, subcontract, or other transaction which is under the supervision or jurisdiction of the agency of such appointed member.
It is undisputed that Beychok is the majority stockholder and has an economic interest in WBC, Inc. and that WBC, Inc. *923 entered into a contract with the Athletic Director of LSU for the end zone countdown clock advertisement. We have previously determined that even though there was no direct supervision or jurisdiction by the Board of Supervisors, that under Article VIII, § 7 of the Louisiana Constitution, the Board has general jurisdiction of and is charged with the overall supervision of LSU. Therefore, since the acquisition of goods and services by LSU is a transaction which is under the general but indirect supervision and jurisdiction of the LSU Board of Supervisors, the Commission was correct in concluding that WBC, Inc. violated LSA-R.S. 42:1113 B by having entered into the advertising contract for the end zone countdown clocks.

BREAD CONTRACTS[5]
The opinion of the Commission concluded that Beychok violated LSA-R.S. 42:1111 C(2)(d) and 1112 B(2) and (3) and that WBC, Inc. violated LSA-R.S. 42:1113 B by entering into the bread contracts.
As we have previously discussed, LSA-R.S. 42:1111 C(2)(d) prohibits a public servant from receiving "any thing of economic value" for services rendered to any person who (1) "Has or is seeking to obtain contractual or other business or financial relationships with the public servant's agency" or (2) who "Has interests which may be substantially affected by the performance... of the public employee's official duty." LSA-R.S. 42:1115 A(1) and B(2). LSA-R.S. 42:1112 B(2) and (3) prohibits a public servant from "participating" in transactions involving "any person" of which the public servant is an officer, director, trustee, partner, or employee. LSA-R.S. 42:1113 B prohibits an appointed member of a board or commission or a legal entity in which such member has an economic interest from bidding on, entering into, or in any way being interested in any contract or other transaction which is under the supervision or jurisdiction of the agency of the member.
Part II of the Ethics Code is entitled Ethical Standards for Public Servants and includes LSA-R.S. 42:1111 through LSA-R.S. 42:1124. LSA-R.S. 42:1123 provides:
This Part shall not preclude:
. . . . .
(4) Sharing in any compensation received from the governmental entity by a person of which such public servant owns or controls any portion thereof, provided such compensation was received by such person as a result of having made the lowest sealed competitive bid on a contract or subcontract and having had such bid accepted by the governmental entity or the general contractor, and provided such public servant did not participate or assist in the procurement of the acceptance of such low bid, except as otherwise specifically prohibited by R.S. 42:1113. (Emphasis added)
Therefore, there is an exception as concerns sealed competitive bidding wherein the public servant did not participate or assist in the procurement of the acceptance of such low bids. This is an exception to LSA-R.S. 42:1111 C(2)(d), 1112 B(2) and (3), and 1113 B, unless the concluding portion thereof, namely, "except as otherwise specifically prohibited by R.S. 42:1113," is interpreted to be an exception to the exception.
The Commission strenously contends that the clause "except as otherwise specifically prohibited by R.S. 42:1113" is an exception to the exception. The Commission reasons that LSA-R.S. 42:1123(4) excepts the activity when performed pursuant to the lowest sealed competitive bid when the public servant did not participate or assist in the procurement of the acceptance of such low bid, then excepts from the exception all transactions between members of boards and commissions and their agencies because of the general prohibition provided by LSA-R.S. 42:1113 B. We disagree.
The statutory interpretation asserted by the Commission yields an unconstitutional result. The Commission's interpretation results in board members, and in particular *924 Beychok, being denied equal protection of the law as guaranteed by Art. 1, § 3 of the Louisiana Constitution.
Unless a statute interferes with the exercise of fundamental personal rights, or is drawn upon inherently suspect distinctions such as race or religion, its constitutionality is presumed and the jurisprudence requires only that the classification challenged be rationally related to a legitimate state interest. City of New Orleans v. Dukes, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976); Harry's Hardware, Inc. v. Parsons, 410 So.2d 735 (La.1982). See also, R.J. D'Hemecourt Petroleum v. McNamara, 444 So.2d 600 (La.1983), cert. denied, ___ U.S. ___, 105 S.Ct. 92, 83 L.Ed.2d 39; State v. Petrovich, 396 So.2d 1318 (La.1981); Bazley v. Tortorich, 397 So.2d 475 (La.1981); Brown v. Brown, 459 So.2d 560 (La.App. 1st Cir.1984); Valentine v. Thomas, 433 So.2d 289 (La.App. 1st Cir.1983), writ denied, 440 So.2d 728 (La. 1983); General Motors Acceptance Corp. v. Johnson, 426 So.2d 691 (La.App. 1st Cir.1982), writ denied, 433 So.2d 151 (La. 1983); Borne v. Mike Persia Chevrolet Co., Inc., 396 So.2d 326 (La.App. 4th Cir. 1981), writ denied, 401 So.2d 976 (La.1981).
We have no suspect classifications or fundamental rights involved in the case sub judice. Strict scrutiny, therefore, is not the proper standard of review for these statutes. In order to pass constitutional muster, these statutes must have a rational basis which is reasonably related to a legitimate state purpose.
In Glazer, the appellate court determined that LSA-R.S. 42:1112C, which permits all public employees except appointed members of any board or commission to disqualify themselves from participating in transactions involving their governmental entity when a violation would result, did not deny equal protection. The appellate court stated:
Because appointed members of boards are generally charged with formulating policy and participating in fundamental decision-making proceedings, there is a rational relationship to the state interest of avoiding conflicts of interest without creating unnecessary barriers to public service, as provided in the Code. (417 So.2d at 460)
The purpose of the ethics code is found in Glazer, 417 So.2d at 460, footnote 6 [LSA-R.S. 42:1101B] as follows:
It is essential to the proper operation of democratic government that elected officials and public employees be independent and impartial; that governmental decisions and policy be made in the proper channel of the governmental structure; that public office and employment not be used for private gain other than the remuneration provided by law; and that there by public confidence in the integrity of government. The attainment of one or more of these ends is impaired when a conflict exists between the private interests of an elected official or a public employee and his duties as such. The public interest, therefore, requires that the law protect against such conflicts of interest and that it establish appropriate ethical standards with respect to the conduct of elected officials and public employees without creating unnecessary barriers to public service.
In the case sub judice, there is no rational basis for prohibiting public servants, and Beychok in particular, from entering into a contract with various departments of LSU when such contracts were obtained "as a result of having made the lowest sealed competitive bid ... and having such bid accepted by the governmental entity" providing "such public servant did not participate or assist in the procurement of the acceptance of such low bid." See LSA-R.S. 42:1123(4). There is no actual or even remote conflict of interest, impropriety or appearance of a conflict of interest or impropriety. See Hill v. Com'n on Ethics for Public Employees, 453 So.2d 558 (La. 1984). Furthermore, the Louisiana Procurement Code (LSA-R.S. 39:1551-1755) and the Public Contract Laws (LSA-R.S. 38:2181-3098) structure the procedure for the procurement and administration of such contracts so that any conflicts, which *925 the Ethics Code was designed to prevent, are avoided.
Consequently, the Commission's interpretation of these statutes affords no rational basis which is reasonably related to the furtherance of legitimate state interests as described above, and, therefore, yields an unconstitutional result as applied by the Commission in the instant case.
Furthermore, rules of statutory construction provide that where various statutes deal with the same subject matter they should be harmonized if possible, but if there is a conflict, the statute specifically directed to the matter at issue must prevail as an exception to the statute more general in character. Shaffer v. Illinois Cent. Gulf R. Co., 479 So.2d 927 (La.App. 1st Cir.1985); State Ex Rel. Bickman v. Dees, 367 So.2d 283, 291 (La.1978); Bethard v. State, Through Bd. of Trustees, 430 So.2d 1122 (La.App. 1st Cir.1983), writ denied, 435 So.2d 430 (La.1983). Further, if a law is susceptible to two or more interpretations, the one which affords a reasonable and practical effect to the entire act is preferred over one which renders part thereof meaningless. Bunch v. Town of St. Francisville, 446 So.2d 1357 (La.App. 1st Cir.1984).
For reasons that will be set forth in detail, we find the provisions of both LSA-R.S. 42:1113 and 1123 are in pari materia and should be reasonably construed together if possible.
All portions of the Revised Statutes must be construed as a single act of the legislature, adopted as a whole. See State v. Viator, 229 La. 882, 87 So.2d 115 (1956).
LSA-R.S. 42:1113 broadly and generally prohibits bidding and contracting with the agency, board or commission on which the appointed member serves. LSA-R.S. 42:1123 expressly provides an exception for sealed competitive bids wherein the public servant does not participate or assist in the procurement of the acceptance of such low bid.
Among the multiple policy objectives of the Code are impartiality, fairness and equality of treatment toward those dealing with government, assurance that decisions of public importance will not be influenced by private consideration and maintenance of public confidence in government, together with prevention of use of public office for private gain. LSA-R.S. 42:1101(B); Glazer, 431 So.2d at 752.
Further, there are at least two other areas of public law expressly provided for by legislative acts which should be construed together, including the Louisiana Procurement Code, LSA-R.S. 39:1551-1755 and the Public Contract Laws, LSA-R.S. 38:2181-3098.8.
LSA-R.S. 39:1552 provides that the Louisiana Procurement Code shall be construed and applied to promote its underlying purposes and policies, which include providing for increased public confidence in the procedures followed in public procurement, insuring fair and equal treatment of all persons who deal with the procurement system of the state, providing increased economy and state procurement activities by fostering effective competition, obtaining goods and services at the most reasonable prices, and providing safeguards for the maintenance of a procurement system of quality and integrity.
Although the LSU system is exempt from the requirements of purchasing through the State Central Purchasing Agency, it is still subject to the Procurement Code and all the requirements and regulations promulgated by the Commissioner of Administration. The Procurement Code further recognizes the Purchasing Agent of each campus as the "Chief Procurement Officer" for that campus. Under LSA-R.S. 39:1556(3), the "Chief Procurement Officer" is vested with the authority to resolve any controversy regarding the award of a contract under the Procurement Code. See also, LSA-R.S. 39:1671. If the dispute is not resolved, the administrative appeal is to the Commissioner of Administration, pursuant to LSA-R.S. 39:1681 and the LSU Board is not directly *926 involved in the bid process or any disputes occurring therein.
LSA-R.S. 39:1594 provides that "Contracts exceeding the amount provided by R.S. 39:1596 shall be awarded by competitive sealed bidding." The rest of LSA-R.S. 39:1594 provides in detail the procedures to be followed in awarding state contracts, which are designed to protect the bidder and the public body. See also LSA-R.S. 39:1601, 1671 and 1681 et. seq.
Additionally, the university system is under the Public Contract Law, commonly referred to as the Public Bid Law. See LSA-R.S. 38:2181-3098.8. LSA-R.S. 38:2212 requires that all public works exceeding the sum of $5,000.00 to be paid out of public funds and to be done by a public entity shall be advertised and let by contract to the lowest responsible bidder who had bid according to the contract plans and specifications as advertised and that no such public works shall be done and no such purchase shall be made except as provided in this part. Public Bid Law also provides detailed and comprehensive protections for both the public body obtaining the bids and the lowest responsible bidder. See 38:2212 et. seq.
Louisiana jurisprudence has long recognized that the Public Bid Law is a prohibitory law founded on public policy and was enacted to protect taxpaying citizens against contracts of public officials entered into because of favoritism and to obtain goods and services needed by the public agency at the most reasonable prices.[6]
In Haughton Elevator Division v. State, Etc., 367 So.2d 1161 (La.1979), the Supreme Court stated:
The Louisiana jurisprudence interpreting this statute or its predecessors has long established that a low bidder may on a contract so advertised sue to set aside the award of the contract to another bidder and may enjoin the agency from the execution of such contract, where the agency arbitrarily rejected the low bid. Sternberg v. Board of Commissioners, 159 La. 360, 105 So. 372 (1925); Standard Highway Company v. Police Jury, 158 La. 294, 103 So. 819 (1925); St. Landry Lumber Company v. Mayor and Board, 155 La. 892, 99 So. 687 (1924).
The statute, insofar as it requires advertising and the obtaining of competitive bids, is a prohibitory law founded on public policy. It was enacted in the interest of the taxpaying citizen and has for its purpose their protection against contracts of public officials entered into because of favoritism and possibly involving exorbitant and extortionate prices.
See, e.g., Smith v. Town of Vinton, 216 La. 9, 43 So.2d 18, 21 (1949); Boxwell v. Dept. of Highways, 203 La. 760, 14 So.2d 627, 631 (1943).
The statute vests in the awarding authority the power and discretion to determine the responsibility of the bidder and to reject all bids if none is satisfactory, but the law does not permit the arbitrary selection of one which is higher and the rejection of others which are lower. The discretion must be exercised in a fair and legal manner and not arbitrarily. See, e.g., St. Landry Lumber Company v. Mayor and Board, 155 La. 892, 99 So. 687 (1924).
A comprehensive discussion of Louisiana law in this area is Housing Authority of Opelousas, La. v. Pittman Construction Co., 264 F.2d 695 (U.S.Ct.App. 5th Cir.1959). As correctly summarized by that opinion:
Louisiana follows the general rule of vesting an awarding body with discretion subject to judicial review. Courts will not substitute their judgment for the good-faith judgment of an administrative agency. Nevertheless, an awarding body's administrative discretion must be exercised in a fair and legal manner and not arbitrarily. Consequently, the disqualification *927 of the lowest bidder, without giving the low bidder a fair chance to disprove charges of irresponsibility, offends principles of fair play and is an arbitrary abuse of discretion inconsistent with the letter and the spirit of the Louisiana public contract law.
II.
The requirements of procedural due process apply to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. When protected interests are implicated, the right to some kind of prior hearing is paramount. Board of Regents v. Roth, 408 U.S. 564, 569-70, 92 S.Ct. 2701 at 2705, 33 L.Ed.2d 548 at 552 (1972).
Under the Louisiana jurisprudential interpretations, La.R.S. 38:2211 creates a right in the lowest responsible bidder to receive the advertised contract, if any is let as a consequence of the biddings.
Although not before the court in Haughton, the rationale of Haughton is also applicable to the Louisiana Procurement Code (LSA-R.S. 39:1551-1755).
Therefore, keeping in mind the multiple policy objectives of the Code of Ethics for governmental employees and the policy objectives of the Louisiana Procurement Code and Public Bid Law, all three have many of the same objectives, i.e. to increase public confidence, to insure the fair and equal treatment of all persons who deal with a state agency, and to foster effective competition resulting in economy and savings to the state, it is our considered opinion that LSA-R.S. 42:1123(4) means exactly what it says and that Part II of the Ethics Code does not preclude a person (WBC, Inc.) of which a public servant (Beychok) owns or controls any portion thereof from making a sealed competitive bid on a contract or subcontract when the public servant (Beychok) did not participate or assist in the procurement of the acceptance of such low bid. This is exactly what occurred in the case sub judice, and the Commission was in error in holding WBC, Inc. and Beychok in violation of the Ethics Code as a result of having submitted sealed competitive bids for the bread contracts.
This interpretation harmonizes the various statutes dealing with the same subject matter and is clearly the interpretation which affords a reasonable and practical effect to the entire Code of Ethics and maintains a consistency with the Procurement Code and Public Bid Law, as well as avoids the constitutional pitfalls of the Commission's interpretation.
Counsel for the Commission contends that the possibility of a conflict of interest might arise because the Board of Supervisors or one of its subordinates might have to make decisions concerning the faithful performance of the bread contracts or quality and quantity control.
This contention is without merit since adequate safeguards are provided in the Procurement Code and more specifically LSA-R.S. 39:1671-1673. Cf. also LSA-R.S. 39:1691-1692. Furthermore, in Hill v. Com'n on Ethics for Public Employees, 453 So.2d 558 (La.1984), the Supreme Court held that a remote possibility of a conflict of interest was not sufficient to support a violation of the Code of Ethics. In the case sub judice, we find it difficult to gleen even a remote possibility of a conflict of interest or appearance of impropriety in the bread contracts.
We conclude that the Commission erred in finding that Beychok violated Section 1111 C(2)(d) and 1112 B(3) of the Code and that WBC, Inc. violated Section 1113 B of the Code as concerns the bread contracts.

CONSTITUTIONAL ISSUES[7]
Beychok raises the following constitutional issues:
(1) The public hearing held by the commission violated Beychok and WBC, Inc.'s constitutional right to due process of law in that the legal advisors staff to the commission also served *928 as prosecutor and made recommendations regarding prosecution and statutory interpretation, and prosecuted the charges;
(2) 42:1112C is unconstitutional because it denies appointed members of Board equal protection of the law in they are not allowed to disqualify themselves from participation in a transaction which would otherwise violate the code;
(3) The construction of "participate" as found by the commission is unconstitutional because its meaning is unclear to persons of common intelligence; and
(4) Section 1113 B of the Code is unconstitutionally vague and overbroad.
A. CONSTITUTIONAL ISSUE (1)
Appellant contends that his constitutional rights were violated in that the Commission employed a procedure whereby the staff and legal advisor also served as investigator and prosecutor. Appellant reasons that Mr. Sexton, Counsel for the Commission, and his staff investigate the allegations, sign the charges, prosecute those charges, and on an ex parte basis works with the Commission to prepare the opinion, which violates his constitutional right to due process. This court and the Supreme Court have answered this argument contrary to appellant's position. See IT Corp. v. Com'n on Ethics for Public Emp., 464 So.2d 284 (La.1985); and Broussard v. Com'n on Ethics for Pub. Emp., 461 So.2d 1227 (La.App. 1st Cir.1984).
B. CONSTITUTIONAL ISSUE (2)
Appellant contends that LSA-R.S. 42:1112 C allows all public employees except appointed board members to disqualify themselves from participation in a matter which would violate the code, which denies appointed board members equal protection of the law. Appellant contends that there is no rational basis for this distinction and that the interest in avoiding conflict of interest applies equally to all public employees, not only appointed board members. Secondly, appellant contends that the distinction does not logically further the state interest of avoiding conflict of interest in the case. Appellant reasons that as a member of the Board of Supervisors, he had no involvement with the contract in question, and, thus, there was no potential conflict of interest. This court has previously considered this constitutional question in Glazer v. Commission on Ethics, 417 So.2d 456 (La.App. 1st Cir. 1982), reversed on other grounds, 431 So.2d 752 (La.1983) wherein this court specifically found that there was no constitutional infirmity. See also Hill v. Com'n on Ethics for Pub. Emp., 442 So.2d 592 (La. App. 1st Cir.1983), reversed on other grounds, 453 So.2d 558 (La.1984). See also Broussard v. Com'n on Ethics for Pub. Emp., 461 So.2d 1227 (La.App. 1st Cir. 1984).
C. CONSTITUTIONAL ISSUES (3 and 4)
Appellant contends that a construction of the Ethics Code which would support a finding of a violation in the present case would be unconstitutionally vague and overbroad. Further, appellant contends that the construction of "participate" as urged by the Commission is unconstitutional because its meaning is unclear to persons of common intelligence.
A statute violates the due process clause when "it is so vague and standardless that it leaves judges free to decide, without legally fixed criteria, when an individual must suffer the imposition of burdens or forfeiture of rights."
We are of the opinion that the term "participate" as found in LSA-R.S. 42:1112 B(2) and (3) is sufficiently clear and not wrought with constitutional infirmities. Cf. Williams v. Bd. of Ethics for Elected Offic., 457 So.2d 772 (La.App. 1st Cir.1984), writ denied, 460 So.2d 611 (La.1984).

RES JUDICATA
Appellant contends that the Commission's charges are barred by virtue of the *929 decision of the 19th Judicial District Court in the matter entitled Wolf Bakery Co., Inc. v. La. Commission on Ethics for Public Employees, Board of Supervisors, Louisiana State University and Various University Purchasing Agents, (Docket No. 281335-K) which is now final and must be given effect. Appellant contends that the issue of whether there was a violation of the Ethics Code was before the district court and that a determination was made that there had been no violation. Appellant, therefore, reasons that the prosecution of the charges in the instant matter is barred by the doctrine of res judicata and collateral estoppel.
Appellant's contention is not well founded. The Commission was released from said proceeding on a peremptory exception pleading the objection of no cause of action and that decision is final. Thus, as a result, the Commission was not cast in judgment, and therefore, the plea of res judicata is inappropriate. Additionally, the trial court did not make a final determination.
LSA-R.S. 13:4231 provides:
The authority of the thing adjudged takes place only with respect to what was the object of the judgment. The thing demanded must be the same; the demand must be founded on the same cause of action; the demand must be between the same parties, and formed by them against each other in the same quality.
See also LSA-C.C. art. 2286.
Since the Ethics Commission was dismissed from the prior proceeding, and because the prior proceeding involved an advisory opinion rather than formal opinion of the board after public hearing, two elements of res judicata are absent, namely identity of parties and absence of demand between the same parties formed by them against each other in the same quality. Therefore, appellant's plea of res judicata is without merit.
Appellant's contention that collateral estoppel is applicable is clearly without merit. In Safeco Ins. Co. of America v. Palermo, 436 So.2d 536 (La.1983), the Supreme Court stated:
Collateral estoppel or issue preclusion is not a valid defense in Louisiana. Welch, [v. Crown Zellerbach Corp.] supra [359 So.2d 154 (La.1978)]; State ex rel Guste v. City of New Orleans, 363 So.2d 678 (La.1978). Judicial estoppel does not apply. Doyle v. State Farm (Mut.) Ins. Co., 414 So.2d 763 (La., 1982); Ugulano v. Allstate Ins. Co., 367 So.2d 6 (La., 1978). 436 So.2d at 537

CONCLUSION
Counsel for the Commission in brief suggests that "... the centralif not onlyissue presented by these proceedings is this: MAY MEMBERS OF THE GOVERNING BODIES OF LOUISIANA STATE UNIVERSITY, SOUTHERN UNIVERSITY AND THE COLLEGES AND UNIVERSITIES UNDER THE SUPERVISION OF THE BOARD OF TRUSTEES ENTER INTO EITHER NEGOTIATED OR BID CONTRACTS FOR THE SALE OF GOODS AND SERVICES TO THE UNIVERSITIES THAT ARE UNDER THE SUPERVISION AND JURISDICTION OF THE BOARD UPON WHICH THE MEMBER SERVES?"
We conclude that the answer is that members of the governing bodies of LSU and others in a like situation may not enter into either negotiated or bid contracts for the sale of goods and services to the universities that are under the supervision and jurisdiction of the board upon which the member serves unless the contract is the result of the member having submitted the lowest sealed competitive bid and the member did not participate or assist in the procurement of the acceptance of such low bid, except as otherwise permitted by the Code.
Therefore, we find that the Commission erred in finding Beychok in violation of LSA-R.S. 42:1111 C(2)(d) and 1112 B(3) and WBC, Inc. in violation of LSA-R.S. 42:1113 B as a result of the bread contracts and that portion of the Commission's decision is *930 reversed and set aside. Further, the order of the Commission ordering a discontinuance of the existing contractual arrangements pursuant to sealed competitive bids between WBC, Inc. and LSU and ordering the university to refrain in the future from entering into any business arrangement as a result of a sealed competitive bid wherein the public servant does not participate in the acceptance or rejection thereof is herein reversed and set aside. In all other respects the decision of the Commission is affirmed. Costs of this appeal are to be divided equally between the Commission and Beychok. Costs in the amount of $25.00 are assessed against the Commission.
AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.
NOTES
[1] Although the items furnished by WBC, Inc. included numerous products such as bread, hot dog buns, hamburger buns, snack cakes, po-boy bread, etc., for purposes of this opinion we will refer to all of these contracts as bread contracts.
[2] LSA-R.S. 42:1115(A)(1) and (B) provide as follows:

A. No public servant shall solicit or accept, directly or indirectly, any thing of economic value as a gift or gratuity from any person or from any officer, director, agent, or employee of such person, if such public servant knows or reasonably should know that such person:
(1) Has or is seeking to obtain contractual or other business or financial relationships with the public servant's agency, or
B. No public employee shall solicit or accept, directly or indirectly, anything of economic value as a gift or gratuity from any person or from any officer, director, agent, or employee of such person, if such public employee knows or reasonably should know that such person:
(1) Conducts operations or activities which are regulated by the public employee's agency.
(2) Has interests which may be substantially affected by the performance or nonperformance of the public employee's official duty.
[3] The exemption from the Louisiana Procurement Code are divided into two categories. LSA-R.S. 39:1572(A) exempts governmental bodies from central purchasing and regulations of the Commission. LSA-R.S. 39:1572(B) exempts LSU and certain other universities and public entities from central purchasing only. It provides in pertinent part as follows:

A. Exemption from central purchasing and regulations of commissioner.
Procurement of the following items or by the following governmental bodies shall not be required through the central purchasing agency, but shall nevertheless be subject to the requirements of this Chapter and such regulations as may be promulgated by the head of such governmental body.
. . . . .
B. Exemptions from central purchasing only.
Unless otherwise ordered by regulation of the commissioner with approval of the governor, the following governmental bodies shall not be required to conduct procurement through the central purchasing agency, but shall nevertheless be subject to the requirements of this Chapter and the regulations promulgated by the commissioner.
(1) Louisiana State University System.
[4] See also, Broussard v. Com'n on Ethics for Pub. Emp., 461 So.2d 1227 (La.App. 1st Cir.1984), wherein the Commission concluded that Mr. Broussard had not violated a similar provision of the code, LSA-R.S. 42:1112B(5).
[5] Cf. footnote 1 supra.
[6] Smith v. Town of Vinton, 216 La. 9, 43 So.2d 18 (1949); Boxwell v. Department of Highways, 203 La. 760, 14 So.2d 627 (1943).
[7] These are the remaining constitutional issues raised on this appeal.